TRINA A. HIGGINS, United States Attorney (7349)
ADAM S. ELGGREN, Assistant United States Attorney (11064)
TRAVIS K. ELDER, Assistant United States Attorney (11987)
Attorneys for the United States of America
111 South Main Street, Suite 1800 | Salt Lake City, Utah 84111
Tel: (801) 524-5682 | travis.elder@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MISCELLANEOUS FIREARMS AND RELATED PARTS AND EQUIPMENT LISTED IN EXHIBIT A,<br><br>Defendants *in rem*. | **RESPONSE TO MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:23CV00017-TC-JCB<br><br>Judge Tena Campbell<br>Magistrate Judge Jared C. Bennett |
| Rare Breed Triggers, LLC<br><br>Third-Party Claimant. | |

COMES NOW the Plaintiff United States of America and files the following Response to Third-Party Claimant Rare Breed Triggers' Motion for Summary Judgment (Dkt. No. 30) and respectfully requests the Court deny the Motion. While the government agrees that there is no material dispute between the parties as to the basic operation of the FRT-15, and that the only legal question before the court is whether FRT-15s and their component parts are machineguns under the statutory definition, the government believes the court would benefit from a hearing to better understand the technical operation of the FRT-15 and its rightful application to the statutory machinegun definition in 26 U.S.C. § 5845(b).

1

## BACKGROUND

**A.**     **Investigation and Procedural Posture**

The National Firearms Act ("NFA") defines various firearms, including machineguns; and requires the registration of firearms under certain conditions.[1]  In 1986, Congress outlawed the possession and distribution of machineguns with exceptions that are not applicable here. This is codified in 18 U.S.C. § 922(o).  The NFA defines "machinegun" as follows:

> **(b) Machinegun**
> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b).[2]

In the Spring of 2021, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") began an investigation into the FRT-15[3], an aftermarket drop-in replacement trigger manufactured and sold by Rare Breed Triggers, LLC ("RBT"), that ATF suspected might constitute a machinegun under federal law. In or about June of 2021, ATF sent the FRT-15  to its Firearms and Ammunition Technology Division ("FATD") for an examination to determine

---

[1] The NFA, 26 U.S.C. § 5845(a) *et seq*,
[2] The Gun Control Act defines "machinegun" by reference to the NFA definition.  *See* 18 U.S.C. § 921(a)(24).
[3] "FRT-15" and "RBT Trigger" will be used similarly throughout this brief.

whether the FRT-15 met the statutory definition of a machinegun.[4] On or about July 15, 2021, FATD issued a report, concluding that the FRT-15 is a machinegun under federal law.

The FATD found, in part, that "a device designed to prevent the hammer from positively resetting [like the RBT Trigger] could cause a firearm to shoot automatically more than one shot, without manual reloading, by a single function of the trigger, and would also be classified as a combination of parts designed and intended, for use in converting a weapon into a machinegun; thus a "machinegun" as defined in 26 U.S.C. § 5845(b)."[5]

Subsequently, on multiple occasions but including on July 27, 2021, ATF issued cease and desist letters to RBT and its principals, demanding the cessation of manufacturing and distribution of the RBT Trigger.[6] On multiple occasions but including on about August 19, 2021, RBT President Lawrence Demonico expressed that RBT would not be complying with the cease-and-desist letters.[7]

Following subsequent investigation, and pursuant to federal law, ATF agents seized FRT-15s on three separate occasions, from three separate locations: On or about March 26, 2022, Agents seized FRT-15s and component parts from a third-party contractor, 3rd Gen Machine, in Logan Utah; on or about April 15, 2022, agents seized another group of FRT-15s and component parts from a vehicle DeMonico was driving near Albuquerque, New Mexico; and in or about December 2022, agents seized a third group of FRT-15s from another third-party contractor, North East Coatings in Sanford, Maine.[8]

---

[4] *See* Verified Complaint for Forfeiture *In Rem* ("Complaint"), Dkt. No. 2, at p. 4.
[5] *Id.* at p. 8.
[6] *Id.* at p. 10.
[7] *Id.* at p. 11.
[8] *Id.* at pp. 13-15.

On February 14, 2023, Plaintiff United States filed a Verified Complaint for Forfeiture *In Rem,* Dkt. No. 2, against the defendants, the miscellaneous firearms and parts seized by ATF the previous year. The Complaint cites seven separate Causes of Action by which the FRT-15s are subject to forfeiture to the United States as machineguns, including the following federal statutes: 18 U.S.C. § 924(d) (forfeiture of firearms involved in violations of 18 U.S.C. § 922(o) or 18 U.S.C. § 922(a)(4)); and 26 U.S.C. § 5872 (forfeiture of firearms involved in violations of 26 U.S.C. § 5861(d), 26 U.S.C. § 5861(e), 26 U.S.C. § 5861(f), 26 U.S.C. § 5861(i), or 26 U.S.C. § 7302)).

On March 30, 2023, RBT filed a claim for the defendant property. Dkt. No. 6. About eighteen months later, the Claimant filed the instant Motion for Summary Judgment, Dkt. No. 30. In between the two filings, litigation over the legality of the FRT-15 was conducted in jurisdictions outside the District of Utah.

Prior to the filing of the complaint in this matter, litigation commenced in the Eastern District of New York over the FRT-15.[9]  The New York court determined on September 5, 2023, at the preliminary injunction stage, that "the Government has demonstrated that it is highly likely to succeed in proving that the FRT-15 satisfies the statutory definition of a machinegun."  On July 23, 2024, the U.S. District Court in the Northern District of Texas issued a final order granting summary judgment against the United States[10] which enjoined the government from undertaking various enforcement actions against some of the parties to that suit premised on the view that the FRT-15 is a machinegun and purported to vacate ATF's classification of the FRT-

---

[9] *U.S. v. Rare Breed Triggers, LLC, et al*, E.D.N.Y 2024. This litigation also concerns the question of whether the FRT-15 is a machine guns and is ongoing.
[10] *National Association for Gun Rights, Inc. v. Garland*, 423-cv-0830 (N.D. Tex. July 23, 2024), 2024 WL 3517504.

15.  Additionally, on June 14, 2024, the U.S. Supreme Court handed down a decision in *Garland*

*v. Cargill*, 602 U.S. 406 (2024), that invalidated an ATF regulation classifying "bump stocks"[11]

as machineguns.

Claimant RBT filed the instant Motion for Summary Judgment on September 26, 2024.

Dkt. No. 30.

**B.    The Eastern District of New York**

On January 23, 2023, the United States filed a complaint in the Eastern District of New

York under the Fraud Injunction Act, 18 U.S.C. § 1345 against Claimant, its owner, Kevin

Maxwell, Lawrence DeMonico, and an associated entity, Rare Breed Firearms, LLC, ("Rare

Breed Parties") alleging that they engaged in mail and wire fraud under 18 U.S.C. §§ 1341 and

1343, a conspiracy to defraud the United States under 18 U.S.C. § 371, and conspiracy to

commit wire and mail fraud under 18 U.S.C. § 1349, with respect to their marketing,

manufacture, sale, and distribution of the FRT-15.  *See United States v. Rare Breed Triggers,*

*LLC,* 690 F. Supp. 51, 59 (EDNY 2023).  After holding a preliminary injunction hearing on

August 1 and 2, 2023, the New York Court issued a preliminary injunction restraining the Rare

Breed Parties from engaging in any sales of the FRT-15, forced reset triggers, and other

machinegun conversion devices ("MCDs").  *Id.* at 123.  The preliminary injunction extends, in

addition to the named defendants, to "their agents, officers, employees, and all other persons and

entities in active concert or participation with them…."  *Id.*  In issuing the preliminary

---

[11] A bump stock does not modify the trigger of a rifle in any way but instead replaces, or attaches to, the back end of
a semiautomatic rifle. Essentially, when the rifle is fired, the bump stock harnesses the gun's own backward force to
push forward off of the operator. This creates a back-and-forth motion that, as long as constant pressure is put on the
trigger, can result in multiple firings of the weapon without ever releasing and re-pulling the trigger.

injunction, the Court determined that "the Government has demonstrated that it is highly likely to succeed in proving that the FRT-15 satisfies the statutory definition of a machinegun." *Id.* at 75, 88.   The preliminary injunction is on appeal at the Second Circuit.  *See* Case No. 23-7276 (2d Cir. 2023).

      **C.**      **<u>The Northern District of Texas</u>**

On August 9, 2023, while this matter and the matter in EDNY were pending, and after the Court in EDNY held its preliminary injunction hearing, an organization called the National Association of Gun Rights, along with others, filed suit in the Northern District of Texas asserting that the FRT-15 is not a machinegun.  *National Ass'n for Gun Rights, Inc., et al., v. Garland, et al*., No. 23-cv-830 (N.D. Texas) (hereinafter "*NAGR*"), Dkt. 1.  Though Claimant did not reveal at the time of the filing of the complaint in NDTX that it was a member of NAGR, it asserted that it was a member at summary judgment.  *NAGR* Dkt. 62 at 30-31.  The Texas court initially entered a preliminary injunction. In doing so, it made clear that "to the extent" the Rare Breed Parties "are members of any Organizational Plaintiff" in that case, its injunction did not apply to those parties, citing the need to avoid "trenching on the E.D.N.Y. decision." *NAGR*, Dkt. 53, at 43-44.  The parties cross-filed for summary judgment.  On July 23, 2024, the court in Texas ruled in favor of the plaintiffs and the next day entered a Final Judgment. *See NAGR*, Dkts. 100-01. The court vacated ATF's classification of the FRT-15 as an illegal machinegun and enjoined the Government from taking criminal or civil enforcement actions against certain parties to that suit who made, sold, or possessed FRT-15s. In its opinion, however, the Texas court recognized that the Eastern District of New York had already entered an injunction against Claimant, and that other cases implicating the FRT-15 may be pending. *See National Ass'n for*

*Gun Rights, Inc. v. Garland,* ___ F. Supp. 3d ___, 2024 WL 3517504 at *27 (N.D. Texas July

23, 2024).  Accordingly, the Texas court applied the injunction only "to the extent that it does

not interfere with other courts, such as the civil jurisdiction over the Rare Breed Parties and other

criminal cases against individuals already subject to prosecution."  *NAGR*, Dkt. 101 at 2.

The Texas court's final judgment has been appealed to the Fifth Circuit.  Dkt. 24-10707

(filed August 1, 2024).

**D.**  ***Garland v. Cargill***

On June 14, 2024, the Supreme Court issued its decision in *Garland v. Cargill*, 602 U.S.

406 (2024), in which the Court held that non-mechanical bump stocks—a different device than

the FRT-15—are not machineguns under the statutory definition.  In doing so, it vacated an ATF

regulation issued after an October 2017 mass shooting in Las Vegas, Nevada, in which the

assailant, utilizing firearms equipped with bump stocks, murdered 58 people and wounded over

500 people.  The ATF regulation sought to clarify the statutory definition of a "machinegun,"

and the term "single function of the trigger" to include non-mechanical bump stocks as falling

within these definitions.  *See generally, id.*

Importantly, *Cargill* dealt only with non-mechanical bump stocks and their use on

firearms with standard semi-automatic triggers.  The FRT-15 is neither a non-mechanical bump

stock nor a standard semi-automatic trigger.  Further, *Cargill* explains the mechanical operation

of a semi-automatic trigger and directs courts to consider a firearm's entire firing cycle to

determine whether a firearm is a statutory machinegun.  As will be discussed, *Cargill* supports

ATF's long time view, consistent with the Eastern Districts of New York's findings, that the

FRT-15 is a machinegun under the statutory definition.

**E.**   **Facts Not in Dispute**

1.   <u>The Claimant's List of "Undisputed Facts"</u>

a.   The Defendant Property consists entirely of forced reset triggers and component parts thereof ("FRTs"), specifically, Rare Breed Triggers FRT-15 and Wide Open Triggers WOT.

RESPONSE: Undisputed as to characterization of Defendant Property consisting entirely of FRT-15s and component parts.

b.   *NAGR* court vacated the ATF's classification of FRTs, including the Rare Breed Triggers FRT-15 and Wide Open Triggers WOT, as machineguns and expressly declared that FRTs are *not* machineguns.

RESPONSE: Undisputed as to what the *NAGR* court stated in its ruling. The parties dispute the legal significance and application of the ruling. Additionally, the ruling itself is under appeal and may not stand.

c.   In its judgment, the *NAGR* court specifically addressed and included the Rare Breed Triggers FRT-15 and Wide Open Triggers WOT.

RESPONSE: Undisputed. Again, the parties dispute the significance and application of the *NAGR* court's ruling.

d.   In its judgment, the *NAGR* court specifically identified Rare Breed Triggers as a member of the plaintiff organization.

RESPONSE: Undisputed that the *NAGR* court identified Rare Breed Triggers as member of the plaintiff organization, but the United States is contesting whether Rare Breed Triggers was properly shown to be a member of NAGR at the time

8

the suit was filed.  The United States does not concede that Rare Breed Triggers is entitled to any relief or was properly a party to the *NAGR* court's decision.

2.   <u>There Is No Disagreement About How the FRT-15 Operates</u>

As discussed, the manner in which the FRT-15 operates has been litigated before two district courts.  The United States believes the parties agree about its basic operation.  *See Rare Breed Triggers*, 690 F.Supp.3d at 62 ("Importantly, although the parties disagree as to whether the FRT-15 satisfies the legal definition of a machinegun, the parties do agree how the FRT-15 works as a technical matter, as compared to standard semi-automatic and automatic triggers."); *NAGR*, 2024 WL 3517504, at * 5 ("[T]he hearing made clear that there are no factual disputes regarding how [the FRT-15] work[s].  Instead, the hearing confirmed that the parties' dispute centers entirely on a legal question: whether [the FRT-15] qualif[ies] as [a] machinegun[] under the statutory definition.").  A full discussion of the FRT-15's cycle of operation can be found in *Rare Breed Triggers*, 690 F.Supp.3d at 64-65.

## ARGUMENT

### A.   **Legal Standard for Summary Judgment**

The United States generally agrees with the Claimant's description of the appropriate legal standard to apply when reviewing a motion for summary judgment,[12] but would add the following: "Rule 56 … requires a district court to enter judgment on a claim or defense if 'there is no dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Dupree v. Younger*, 596 U.S. 729, 731 (2023) (citing Fed. R. Civ. P. 56(a)). Additionally,

---

[12] *Motion*, Dkt. No. 30 at 9-10.

summary judgment motions may be denied if the law is not on the movant's side. *Id*. at 737

("Rule 56 … contemplates that the court will sometimes deny the motion because the facts are

genuinely in dispute and other times because the law does not support the movant's position.")

Courts must correctly apply the substantive law in granting a motion for summary judgement.

*Clifton v. Craig*, 942 F.2d 182, 183 (1991). Finally, if "reasonable minds could differ as to the

import of the evidence," summary judgment should not be granted. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 250-251 (1986) (analogizing summary judgment and directed verdict).

**B.    Claimant Is Not Entitled to Judgment as a Matter of Law**

Claimant is not entitled to summary judgment because the devices at issue here are

machineguns as defined under Federal law.  Claimant's argument to the contrary misreads

Supreme Court precedent and improperly attempts to rely on a decision from another district

court that expressly preserves this Court's ability to independently decide the merits.

**1.    The FRT-15 is a Machinegun**

The primary question in dispute is whether the FRT-15 is a machinegun under federal

statutes. 18 U.S.C. § 921(a)(23) provides that the term "machinegun" has the meaning given

such term in section 5845(b) of the National Firearms Act.  26 U.S.C. § 5845(b) in turn defines

machinegun as "any weapon which shoots, is designed to shoot, or can be readily restored to

shoot, automatically, more than one shot, without manual reloading, by a single function of the

trigger."  The provision goes on to define the term to include, in pertinent part, "any part

designed and intended solely and exclusively, or combination of parts designed and intended, for

use in converting a weapon into a machinegun…."  26 U.S.C. § 5845(b).  These parts and

combinations of parts, are generally referred to a "machinegun conversion devices" or "MCDs."

The term "forced reset trigger" is an industry term without a statutory definition.  The FRT-15s at issue in this matter replaces the standard trigger assembly on a semiautomatic rifle and allow a shooter to engage the trigger once to fire the weapon repeatedly so long as the shooter continues to engage the trigger.  In doing so, firearms equipped with an FRT-15 achieve rates of fire comparable to, or exceeding those, of commercially manufactured machineguns.  The manner in which a forced reset trigger modifies or converts a semiautomatic firearm may bring the device within the definition of "machinegun" provided in 26 U.S.C. § 5845(b).  This determination requires a factual assessment of the technical operation and function of the device, and application of that those facts to the statutory definition.  ATF has long viewed devices operating on similar mechanical principles as those possessed by Defendant to be machineguns under federal law.  *See Rare Breed Triggers,* 690 F. Supp.3d at 65-70 (discussing a predecessor device to the FRT-15 determined by ATF in 2018 to meet the statutory definition of a machinegun, and a similar device determined by ATF to meet the statutory definition of a machinegun in 2006).

As the Supreme Court stated in *Cargill*, a semiautomatic firearm with a standard trigger assembly, will fire "only one time" when the shooter "engag[es] the trigger," and "[t]he shooter must release and reengage the trigger to fire another shot."  *Cargill*, 602 U.S. at 411-12.  It is this manual "release" and "reengagement" that is the mechanical hallmark of a semiautomatic firearm.  In contrast, "[m]achineguns can ordinarily achieve higher rates of fire than semiautomatic firearms because the shooter does not need to release and reengage the trigger between shots."  *Id.* at 412.  In other words, with a semiautomatic firearm, the shooter must

release the trigger to fire again; with a machinegun, the shooter must release the trigger to stop firing.

*Cargill* identifies several distinct mechanical components that will be present in a semiautomatic trigger assembly:

> The trigger is a simple lever that moves backward and forward. The square point at the top ledge of the trigger locks into a notch at the bottom of the hammer. The hammer is a spring-loaded part that swings forward toward the barrel and strikes the firing pin, causing a shot to fire. The disconnector is the component responsible for resetting the hammer to its original firing position after a shot is fired.

*Id.* at 417 (internal citations omitted). The Court then goes on to describe the cycle of operations in such a trigger:

> When the shooter engages the trigger by moving it backward … the square point of the trigger pivots downward…. This movement releases the spring-loaded hammer….
>
> At the top of the hammer's rotation, it strikes the firing pin, causing the weapon to fire a single shot.
>
> The firearm than ejects the spent cartridge from the chamber and loads a new one in its place. The mechanism that performs this task swings the hammer backward at the same time.
>
> As the hammer swings backward, it latches onto the disconnector. This latching … prevents the hammer from swinging forward again after a new cartridge is loaded into the chamber. The disconnector will hold the hammer in that position for as long as the shooter holds the trigger back, thus preventing the firearm from firing another shot.
>
> Finally, when the shooter takes pressure off the trigger and allows it to move forward … the hammer slips off the disconnector…. The trigger mechanism is thereby reset to the original position…. **A semiautomatic rifle must complete this cycle for each shot fired**.

*Id*. at 418-21 (emphasis added) (internal citations and illustrations omitted).

Importantly, in addition to noting that a semiautomatic firearm must complete this entire cycle for each shot fired, the Court stated that "this complete process is what constitutes a 'single function of the trigger." *Id.* at 421.  Thus, for purposes of the statutory definition of machinegun, the court must look to the entire firing cycle to determine whether a firearm "shoots, is designed to shoot, or can be readily restored to shoot, automatically, more than one shot, without manual reloading, by a single function of the trigger."  *See* 26 U.S.C. § 5845(b).

As noted by the Court in *Cargill*, the need for release and reengagement in a semiautomatic firearm results from the operation of a component called the "disconnector," which prevents the firearm from firing again by retaining the weapon's "hammer" (the component that strikes the firing pin for each shot) until the trigger is released.  *Id*. at 419-21.  The disconnector stops the firing cycle, requiring a separate and distinct function of the trigger to fire another shot.  *Id.* at 420.

By contrast, a machinegun firing automatically does not use a disconnector. Machineguns, like the M-16, instead employ a component called an "auto sear."  The auto sear "catches the hammer as it swings backwards, but will release [the hammer] again once a new cartridge is loaded if the trigger is being held back."  *Id.* at 420 n.4.  Functionally, the auto sear briefly retains the hammer between shots to allow the weapon to safely reload, and then is automatically tripped by the "bolt carrier" of the weapon to fire the next shot.  In this way, the auto sear serves two functions: (i) where present, it disengages the disconnector to allow automatic, continuous fire by a single function of the trigger; and (ii) it times the cycle of operation so that the hammer is released only when the next cartridge is properly chambered in order to avoid a malfunction.

13

Like the machineguns and auto sears discussed in *Cargill*, the FRT-15 also eliminates the need for the shooter to release and reengage the trigger between shots. Instead, the FRT-15 converts a semiautomatic firearm by replacing the entire standard semiautomatic trigger assembly to allow the shooter to engage the trigger only once to fire continuously. The FRT-15 lacks a disconnector to interrupt the firing cycle – the hallmark component of a standard semiautomatic trigger assembly. *See Cargill*, 602 U.S. at 417-21.

When the shooter engages the trigger, the trigger assembly will continue the firing cycle, causing the weapon to fire more than one round, automatically, until the shooter disengages the trigger or the firearm's ammunition supply is exhausted. The devices achieve automatic fire through a component called the "locking bar" which serves the same purpose as an auto sear. This component momentarily delays release of the hammer—timing the firearm as an auto sear would do—until the weapon is ready to be fired in order to prevent a malfunction. Like an auto sear, the locking bar is tripped by the bolt carrier[13] to enable the subsequent shot. The chief difference between an auto sear and the locking bar is that while an auto sear retains the hammer directly, the locking bar does so indirectly by briefly restraining the movement of the trigger as the shooter continues the initial engagement. In a firearm equipped with one of these devices, the trigger moves as part of the automatic mechanical process of retaining and releasing the hammer. But that difference does not change the status of the devices: with both types of firing mechanisms (auto sear and locking bar), the hammer is automatically and repeatedly released by

---

[13] An M16 machinegun uses a machinegun bolt carrier which has a sear trip surface area that trips the automatic sear disengaging the hammer from the automatic sear. To function properly, the FRT-15 must be used in a firearm equipped with a machinegun bolt carrier so the sear trip surface area may interact with the locking bar in the same manner as the automatic sear in a machinegun.

a single engagement—"single function"—of the trigger, and the firearm will continue to fire automatically so long as the shooter continues to engage the trigger.

That conclusion is further reinforced by *Cargill*'s discussion of the statutory definition as a whole.  As the Court observed, "Congress defined a machinegun by what happens 'automatically' 'by a single function of the trigger,'" and "[s]imply pressing and holding the trigger down on a fully automatic rifle … is what causes the trigger to function in the first place." *Cargill*, 602 U.S. at 408; *accord Cargill v. Garland*, 57 F.4th 447, 463 (5th Cir. 2023) (en banc) (plurality opinion) ("[T]he act of pulling and holding the trigger is one function, and that function produces more than one shot.").  The same is true here: as the *Rare Breed Triggers* court observed, "the repetitive mechanism in the FRT-15 is entirely self-executing until the shooter releases the trigger, notwithstanding that the trigger mechanically pushes against the shooter's finger throughout the process."  690 F. Supp. 3d at 84.

In sum, the FRT-15 is a machinegun because the shooter engages the trigger just once to initiate the firing sequence, and that single engagement begins an automatic cycle of fire that is the product of "a single function of the trigger."

> **2.** ***NAGR* is Unavailing to Claimants**

> a.   The Texas Court Applied the Wrong Standard Under *Cargill*

The *NAGR* court read *Cargill* as establishing—and reaffirming its own view—that the statutory "definition is solely concerned with the mechanical operation of the trigger rather than the actions of the user," and concluded that "the operative mechanical function of the trigger is to release the hammer." *NAGR*, 2024 WL 3517504, *19.  In the Texas court's view, FRT-15s are not machineguns because "for each and every round fired, the trigger moves forward into its

reset state and is depressed to release the hammer from its sear surface," which the district court regarded as multiple separate "functions" of the trigger. *Id.* Thus, the *NAGR* court concerned itself with only one aspect of the firing cycle – the release of the hammer – without taking into consideration the entire firing cycle.

For several reasons, *Cargill* did not embrace the rule the Texas court adopted. First, *Cargill* repeatedly emphasized that with a semiautomatic weapon a shooter "must release and reengage the trigger to fire another shot," while with a machinegun "a shooter can fire multiple times, or even continuously, by engaging the trigger only once." 602 U.S. at 410-411. The *NAGR* court did not address this language, or the Court's explanation that the "complete process" of "a 'single function of the trigger'" includes not only the initial engagement of the trigger but also the subsequent disengagement of the trigger by "tak[ing] pressure off" the trigger. *Id.* at 420.

Second, *Cargill* did not pin the "function of the trigger" exclusively to the release of the hammer. Rather, the release of the hammer is only one part of the complete firing cycle. *Id.* at 417-21. Instead, *Cargill* addressed several steps in the mechanical process—and the shooter's acts of engagement and disengagement required to carry out the mechanical process—that together constitute the entire firing cycle. It was this complete firing cycle that *Cargill* identified as the "function of the trigger." *Id.* at 421 ("A semiautomatic rifle must complete this cycle for each shot fired[]" and "ATF does not dispute that this complete process is what constitutes a 'single function of the trigger.'").

Third, the Texas court failed to consider the role of the disconnector in a standard semiautomatic rifle, much less the mechanical and legal consequences that follow from the

absence of that component in the FRT-15.  *Id.; see generally NAGR*, 2024 WL 3517504.  As

*Cargill* explained, "[t]he disconnector is the component responsible for resetting the trigger to its

original firing position after a shot is fired" and "[t]he disconnector will hold the hammer in that

position for as long as the shooter holds the trigger back, thus preventing the firearm from firing

another shot."  *Garland v. Cargill*, 602 U.S. 406, 417, 420 (2024); *see also Rare Breed Triggers*,

690 F.Supp.3d at 64 ("However—unlike a trigger in a semi-automatic weapon—the FRT-15 has

no disconnector.").

  Having incorrectly tied the function of the trigger solely to the release of the hammer, and

identified trigger movement as the operative mechanical process, the Texas court misconstrued

the role of the locking bar in the firing cycle of the FRT-15 and its legal implication. *See NAGR*

at \*20 ("An FRT-equipped firearm contains a locking bar that prevents a subsequent trigger

function until the weapon is safe to fire again.  But this is not the same as an auto sear.…

Because the FRT's locking bar does not alter the basic mechanical process where the trigger

moves for every shot fired, this distinguishes an FRT from a fully automatic weapon with an

autosear.").  Though seemingly recognizing that the locking bar served the same function as an

auto sear—to time the firearm and prevent a malfunction during automatic operation—the Texas

court nonetheless mistakenly found that the locking bar was inconsequential to its analysis of the

FRT-15 under the statutory definition.  *But see Rare Breed Triggers*, 690 F.Supp.3d at 63, 64

("[An] auto sear 'times' the device to make sure that a bullet is in the chamber by the time the

hammer strikes the firing pin again" and "[t]he locking bar 'times' the device to make sure that a

bullet in in the chamber by the time the trigger is free to release the hammer again.").

Moreover, *Cargill* does not suggest that a device is not a machinegun because the trigger moves automatically for each shot.  And it does not call into question decisions holding that such devices are machineguns.  In *United States v. Carter*, for example, the Sixth Circuit considered a firearm that lacked a standard trigger and would fire repeatedly if a shooter manually pulled back and released the bolt.  Once the bolt was released it "would go forward [stripping] a cartridge off out of the magazine into the chamber and it would fire" and the bolt would then "retract" and go forward to fire again with no further engagement by the shooter.  465 F.3d 658, 665 (6th Cir. 2006) (*per curiam*).  The bolt is the "trigger" on such a weapon because it initiates firing, but the repeated automatic movements of that trigger—even though necessary to fire the weapon and "reset" the trigger between shots—do not change its status as a machinegun.  *Cargill* likewise declined to address any other device, including mechanical bump stocks such as the Akins Accelerator, in which a spring repeatedly and automatically forced the trigger against the shooter's stationary finger for each shot fired.  *Cargill*, 602 U.S. at 406 n.1.

As noted, there is no point at which the FRT-15 is disengaged (or "released") to be re-engaged for another shot.  Instead, after the initial engagement of the trigger, the weapon fires repeatedly as a result of the automatic operation of the device, so long as the shooter continues to engage the trigger.  The subsequent movements of the trigger are not the result of separate and distinct "engagements" or "functions," but are rather the result of an automatic mechanical process after the shooter engages the trigger once.

The Texas court's failure to recognize key distinctions between the devices at issue here and the bump stocks at issue in *Cargill* is underscored by its mistaken belief that ATF's understanding of these devices was the outcome of the same rulemaking that concluded that non-

mechanical bump stocks were machineguns. The district court stated, for example, that it was three years after ATF "broadened its interpretation of the statutory definition" in the 2018 bump-stock rulemaking that ATF "appl[ied] the revised definition of 'machinegun' to FRTs." *NAGR,* 2024 WL 3517504, at *3.

That was manifestly incorrect, and the bump stock rule has no bearing on whether the statute applies to the devices at issue here. The bump stock rule was promulgated in December of 2018 and marked the first time that ATF concluded that non-mechanical bump stocks were machineguns. *Bump-Stock-Type Devices*, 83 Fed. Reg. 66,514 (Dec. 26, 2018).

In contrast, ATF has regarded devices of the kind at issue here as machineguns since first encountering one in 1975, and reached the same conclusion in 1994, 2004, 2005, 2006, and 2017. *See e.g., Rare Breed Triggers*, 690 F.Supp.3d at 68-69 (discussing ATF's 2006 conclusion that a similar device was a machinegun and that the Rare Breed Parties were informed of that conclusion). Indeed, in August of 2018—four months before the bump stock rule was promulgated—ATF concluded that the AR1, the predecessor device to the FRT-15, was a machinegun. *Id.* at 65-67. That history was crucial to the district court's conclusion in *Rare Breed Triggers* that Claimant likely misled their customers about whether these devices would be regarded as machineguns under the statute. *Id.* at 91-101.

The Texas court never addressed ATF's consistent treatment of similar devices, the *Rare Breed Triggers* court's conclusions, or the uncontradicted testimony of ATF's expert. Nor has claimant ever disputed that the devices addressed by ATF in the past are materially similar to the FRT-15. Claimant and the Texas court fundamentally erred in their application of the Supreme

Court's decision addressing a significantly different device that is the subject of a very different regulatory history.

      b.      <u>The *NAGR* Vacatur Has No Bearing Here</u>

Claimant argues that the Texas court's vacatur of the ATF classification of the FRT-15 applies to this matter.  Claimant is incorrect in several respects.

As an initial matter, the Texas court was not specific about what ATF action it was "vacating" as reflecting "ATF's unlawful action—classification of FRTs as machineguns" *NAGR*, 2024 WL 3517504.  In fact, ATF has not promulgated any rule or regulation classifying the FRT-15 as a machinegun.  Regardless, the propriety or contours of that order do not change the fact that this Court is simply asked to engage in a *de novo* review and reach its own interpretation of the statute as applied to these devices, without relying on or deferring to any ATF "classification" of the FRT-15, or refutation thereof.  The same was true in the EDNY suit, where the court did not defer to or rely on any ATF classification when ultimately determining that the government was "highly likely to succeed in proving that the FRT-15 satisfies the statutory a machinegun" but relied on its own application of the statute to the device.  *Rare Breed Triggers*, 690 F.Supp.3d at 75.

The decision in *NAGR* does not and cannot control the meaning of the statute nationwide; only a decision of the Supreme Court can have that effect. Thus, whatever the propriety or practical effect of the Texas court's "vacatur" of ATF's "classification"—points contested in the pending Second and Fifth Circuit appeals—it plainly does not and cannot control whether the statute covers the FRT-15, and cannot dictate how other courts, including this Court, interpret the statutory language and apply that language to the Defendant Property.

c.     Collateral Estoppel Is Not Applicable

Plaintiffs cannot avoid litigating the merits of this suit by invoking collateral estoppel. Collateral estoppel is fundamentally "an equitable doctrine" based on "considerations of fairness in the individual case." *PenneCom B.V. v. Merrill Lynch & Co., Inc.*, 372 F.3d 488, 493 (2d Cir. 2004); *accord Blonder-Tongue Labs. Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 334 (1971) ("In the end, decision [on estoppel] will necessarily rest on the trial courts' sense of justice and equity."); *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1221 (10th Cir. 2013).

In entering judgment, the Texas court made clear that its ruling should not preclude further litigation by other courts.  That court emphasized that "respect for coordinate courts . . . guides the scope of the relief awarded here." *NAGR*, 2024 WL 3517504 at *27. The Texas court's judgment thus made clear that its injunctive relief applied only "to the extent that it does not interfere with other courts, such as the Eastern District of New York's civil jurisdiction over the Rare Breed Parties." *Id.* at 28.[14]

Accordingly, by its express terms, the injunctive relief provided by the Texas Court applies to the Rare Breed Parties, which include claimant, only to the extent it does not interfere with the New York litigation. Further, by its express terms, the relief granted by the Texas court applies only to the extent that it would not interfere with "other courts," such as this one. *Id.*

---

[14] In the Fifth Circuit appeal, the government is contesting whether the Rare Breed Parties were properly shown to be members of NAGR at the time the suit was filed, and thus does not concede that the Rare Breed Parties were properly entitled to any relief or were properly parties to the Texas court's decision. But regardless of whether the Rare Breed Parties were actually parties to the Texas court's decision, the Texas court's express disclaimer of any intent to interfere with other cases would render application of collateral estoppel inappropriate.

The Texas court also appeared to recognize that under Fifth Circuit precedent it could not properly preclude the government from litigating the issue here. Fifth Circuit precedent makes clear that "where duplicative issues and parties exist in two cases the court with the first case should resolve the issues between the parties and the second court should defer," a rule "grounded in principles of comity and sound judicial administration." *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997); *accord West Gulf Mar. Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728-30 (5th Cir. 1985).

The district court acknowledged this general rule in limiting its relief, citing *West Gulf* in explaining that "Fifth Circuit precedent is clear regarding overlapping decisions from coordinate courts." *NAGR*, 2024 WL 3517504 at *27. By taking that course, the Texas court was able to grant relief to the other parties before it—including members of NAGR aside from the Rare Breed Parties—"without trenching upon the E.D.N.Y. decision," *id.*, or interfering with "other courts, such as the E.D.N.Y Lawsuit's civil jurisdiction over the Rare Breed Parties." *Id.* at *28.

Accordingly, under Fifth Circuit precedent, with respect to the Rare Breed parties, the *NAGR* court properly deferred. Both this action, and the New York court action, preceded the filing of the Texas case by many months, and are expressly carved out from the Texas court's judgment.

## CONCLUSION

Summary judgment for Claimant Rare Breed Triggers is not appropriate in this case, where there remains a dispute over whether FRT-15s are "machineguns," where evidence shows that the RBT Triggers are machineguns, and where Supreme Court precedent in *Cargill* supports that assertion. The Claimant's assertion that the *NAGR* decision supports summary judgment in

their favor is demonstrably incorrect for multiple reasons, and further, collateral estoppel is not

available.


      Respectfully submitted,

TRINA A. HIGGINS
United States Attorney


/s/ *Adam Elggren*
Adam Elggren
Assistant United States Attorney